**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN CHECCHIA**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-444-KSM** |
| **SOLO FUNDS**, | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                           **June 7, 2023**

Plaintiff Steven Checchia, individually and on behalf of a putative class, sued Defendant Solo Funds Inc. ("SoLo") for violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the Loan Interest and Protection Law, and the Consumer Discount Company Act in the Philadelphia County Court of Common Pleas.  (Doc. No. 1, Ex. A ("Compl.").)  SoLo removed the case to this Court (*see* Doc. No. 1) and has moved to compel Checchia to arbitrate his claims, arguing that when Checchia created his SoLo account, he agreed to SoLo's Terms and Conditions, which contained an arbitration provision (Doc. No. 8).  Checchia opposes the motion, contending that SoLo cannot prove that a valid agreement to arbitrate exists and that even if such an agreement did exist, the arbitration provision is unenforceable.  (Doc. No. 12.) The Court held oral argument on May 23, 2023.

For the reasons discussed below, the Court denies SoLo's motion.

**I.    Background: The Complaint**

The following facts are taken from Checchia's Complaint.

### A.  SoLo's Business Model

SoLo[1] owns and operates a lending mobile application called "SoLo."[2]  (Compl. at ¶ 9; *see also id.* at ¶ 8 (SoLo "makes loans or advances to Pennsylvania consumers over the internet").)  The application "connect[s] investors who wish to fund advances to consumers who wish to obtain advances."  (*Id.* at ¶ 10.)  "To obtain an advance through the [SoLo] app, consumers enter the amount they seek and the term to repay that amount," and "are then asked if they wish to pay money to obtain their advance."  (*Id.* at ¶¶ 15–16.)  "Specifically, consumers are asked if they wish to 'tip' the investor that funds their advance, and if they wish to 'donate' to [SoLo] for issuing their advance."  (*Id.* at ¶ 17.)

SoLo recommends that consumers pay 12% of their advance to the investor (a "tip") and 9% to SoLo (a "donation").  (*See id.* at ¶¶ 17–18.)  "Although consumers can theoretically obtain an advance without paying money, in practice, consumers cannot obtain an advance through the [SoLo] app without agreeing to pay money to obtain the advance."  (*Id.* at ¶ 19.)  "The 'tips' and 'donations' consumers must pay to obtain their advance are costly."  (*Id.* at ¶ 21.)  SoLo also obtains other fees from the consumers who have received advances, such as recovery fees, late fees, administrative fees, and synapse transaction fees.  (*See id.* at ¶¶ 36, 39–40.)

Ultimately, Checchia claims that SoLo "misrepresents that its advances cost nothing" to consumers.  (*Id.* at ¶ 24; *see also id.* at ¶¶ 25–26 (alleging that SoLo's promissory note and Truth-in-Lending Act ("TILA") disclosures include "false" representations, since they state that

---

[1] SoLo is a technology company, not a bank.  (Compl. at ¶¶ 6–8.)

[2] According to SoLo's Director of Product, Eddy Muñoz, "SoLo provides an online platform that connects third-parties seeking to borrow money (called 'Borrowers') with third-parties offering to lend money (called 'Lenders')."  (Muñoz Aff. at ¶ 3.)  This platform is accessible online on SoLo's website and via the Mobile Application.  (*Id.*)

a consumer's advance has a $0.00 Finance Charge and a 0% annual percentage rate ("APR")
when in actuality "the advances issued through the [SoLo] app have significant costs"); *id.* at
¶ 60 ("The advances [SoLo] issues through the [SoLo] app are payday loans, which have been
repackaged in a user-friendly app, which are deceptively rebranded as no-cost advances, and
which [SoLo] falsely and misleadingly represents as having 0% APRs."); *id.* at ¶¶ 68–69.)
Checchia pleads that SoLo's "business takes advantage of consumers' lack of awareness of how
[SoLo's] fees add up to make the advances facilitated through the [SoLo] app difficult to repay
and more costly than other forms of credit." (*Id.* at ¶ 71.)

### B. Checchia Obtains Advances Through SoLo's Mobile Application

Checchia "obtained various cash advances through the [SoLo] app" for "personal, family,
and/or household purposes." (*Id.* at ¶¶ 76–77.) In doing so, Checchia has paid for "tips" and
"donations." (*Id.* at ¶ 78.) "Each time Checchia paid a 'tip' and/or 'donation,' the charges he
paid, in the aggregate, exceeded 6%." (*Id.* at ¶ 79.) By way of example, on October 21, 2022,
Checchia obtained a $450 cash advance; he paid a $31.50 "donation" to SoLo and a $40 tip to
the investor. (*Id.* at ¶ 80.) "The cash advance was to be repaid in two weeks, yielding a
414.25% APR," notwithstanding SoLo's representation that the advance at issue had a $0.00
Finance Charge and a 0% APR. (*Id.* at ¶¶ 81–82.) Checchia alleges that he was unaware of the
costs associated with SoLo's cash advances and that he has since stopped using the SoLo app.
(*Id.* at ¶¶ 84–85.)

## II. Background: Motion to Compel

Along with its motion to compel, SoLo filed affidavits by Eddy Muñoz, SoLo's Director
of Product, and Albert Wildeman, SoLo's Vice President of Data Analytics. (*See* Doc. Nos. 8-1,
8-2.) SoLo also attached to its motion copies of the SoLo sign-up page and its Terms. (*See* Doc.

3

No. 8-1, Exs. A & B.)  The Court sets forth the relevant facts from those documents below.

### A.  *Checchia's Loans*

Checchia created his SoLo account (the "Checchia Account") on February 26, 2022.

(Muñoz Aff. at ¶ 7; Wildeman Aff. at ¶ 6.)  Checchia signed up for the Checchia Account

through SoLo's Mobile Application.  (Muñoz Aff. at ¶ 7.)

Between February 28, 2022 and the end of 2022, Checchia contracted for 19 loans

through SoLo's Platform, for a combined total amount of $6,175 (the "Loans").  (Wildeman Aff.

at ¶ 7.)  Checchia paid back all but one of the Loans.  (*See id.*)  The timeline of the Loans is

outlined as follows:

1.  On February 28, 2022, a loan in the amount of $100 was funded by a Lender.
    Checchia paid back the loan on March 11, 2022.

2.  On March 26, 2022, a loan in the amount of $150 was funded by a Lender.  Checchia
    paid back the loan on April 8, 2022.

3.  On April 10, 2022, a loan in the amount of $50 was funded by a Lender.  Checchia
    paid back the loan on April 22, 2022.

4.  On April 23, 2022, a loan in the amount of $225 was funded by a Lender.  Checchia
    paid back the loan on May 6, 2022.

5.  On May 7, 2022, a loan in the amount of $300 was funded by a Lender.  Checchia
    paid back the loan on May 20, 2022.

6.  On May 21, 2022, a loan in the amount of $375 was funded by a Lender.  Checchia
    paid back the loan on June 3, 2022.

7.  On June 4, 2022, a loan in the amount of $400 was funded by a Lender.  Checchia
    paid back the loan on June 17, 2022.

8.  On June 18, 2022, a loan in the amount of $200 was funded by a Lender.  Checchia
    paid back the loan on July 1, 2022.

9.  On July 1, 2022, a loan in the amount of $500 was funded by a Lender.  Checchia
    paid back the loan on July 15, 2022.

10. On July 21, 2022, a loan in the amount of $325 was funded by a Lender.  Checchia

paid back the loan on July 29, 2022.

11. On July 29, 2022, a loan in the amount of $500 was funded by a Lender.  Checchia paid back the loan on August 12, 2022.

12. On August 17, 2022, a loan in the amount of $450 was funded by a Lender.  Checchia paid back the loan on August 26, 2022.

13. On August 31, 2022, a loan in the amount of $325 was funded by a Lender.  Checchia paid back the loan on September 9, 2022.

14. On September 9, 2022, a loan in the amount of $350 was funded by a Lender. Checchia paid back the loan on September 23, 2022.

15. On September 23, 2022, a loan in the amount of $500 was funded by a Lender. Checchia paid back the loan on October 7, 2022.

16. On October 7, 2022, a loan in the amount of $425 was funded by a Lender.  Checchia paid back the loan on October 21, 2022.

17. On October 21, 2022, a loan in the amount of $450 was funded by a Lender. Checchia paid back the loan on November 18, 2022.

18. On November 22, 2022, a loan in the amount of $200 was funded by a Lender. Checchia paid back the loan on December 16, 2022.

19. On December 30, 2022, a loan in the amount of $50 was funded by a Lender. Checchia has not paid back the loan.

(*Id.*)  Each of the Loans has a corresponding Loan Agreement and Promissory Note.  (*Id.* at ¶ 8.)

These reference SoLo's Terms and Conditions in the section titled "Default."  (*Id.*)  (*See, e.g.*,

Doc. No. 8-2, Ex. A at 7 (the executed February 28, 2022 Loan Agreement and Promissory Note,

which states: "Borrower may be deemed in default (each, an 'Event of Default') of Borrower's

obligations under this Note if Borrower . . . (4) fails to abide by the terms of this Note or the

SoLo Terms and Conditions").)

### B.  *SoLo's Terms and Conditions*

#### 1.  <u>Overview</u>

"[N]o user [can] lend or borrow money via SoLo's Platform without first creating an

account, which require[s] acceptance of the then-current version of SoLo's Terms and Conditions." (Muñoz Aff. at ¶ 8.)

"To sign-up for SoLo's Platform through the Mobile Application" (like Checchia did to create the Checchia Account), a user must navigate through "a series of screens" and "provide various pieces of information, including a telephone number and a one-time passcode." (*Id.* at ¶ 9.) The final page includes a heading called "Last Step!" (*Id.* at ¶ 10.) On this page, the user is required to enter their name, date of birth, e-mail address, physical address, and social security number. (*Id.*; Doc. No. 8-1, Ex. A at 6–7.)

There are six hyperlinks located directly under where the user enters the aforementioned information, the first of which is entitled "Terms of Service" and enables the user to view the then-current version of SoLo's Terms and Conditions, which is entitled "Terms." (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 6–7.) Directly beneath those six hyperlinks are two checkboxes. (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.) The first box states, "The SSN [social security number] I entered is my own," and the second box states, "I agree to SoLo's Terms & Conditions." (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.) After checking both boxes, the user must click on the button that states "Looks Good, Let's Go" to complete the sign-up process and create a SoLo account. (Muñoz Aff. at ¶ 10; Doc. No. 8-1, Ex. A at 7.)

Terms of Service

Privacy Policy

E-Sign Disclosure

SynapseFi's Terms of Service

SynapseFi's Privacy Policy

Evolve's Deposit Agreement

☐ The SSN I entered is my own

☐ I agree to SoLo's Terms & Conditions

**Looks Good, Let's Go**

A user cannot complete the sign-up process or create a SoLo account until both boxes are checked off.  (Muñoz Aff. at ¶ 10; *see also id.* at ¶ 11 ("Checchia necessarily checked the box stating 'I agree to SoLo's Terms & Conditions' since he completed the sign-up process.").)

SoLo periodically updates its Terms and Conditions.  (*Id.* at ¶ 13.)  After February 26, 2022, SoLo's Terms and Conditions were updated twice; once on March 17, 2022 and again on December 21, 2022.  (*Id.*)

2.  <u>**Arbitration Provision**</u>

All three sets of SoLo's Terms referenced the arbitration provision in bold, capitalized letters in the beginning, before setting forth the individual provisions:

> **THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT AUTHORIZES EITHER PARTY TO ELECT MANDATORY AND BINDING ARBITRATION OF CERTAIN DISPUTES WHERE PERMTITED BY LAW.  THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN THE SECTION ENTITLED 'RESOLUTION OF DISPUTES BY ARBITRATION.'  PLEASE**

**READ THE ARBITRATION PROVISION CAREFULLY.**

(*See* Doc. No. 8-1, Ex. B at 9, Ex. C at 17, Ex. D at 26.)   The arbitration provision itself stated:

> *DISPUTE RESOLUTION*.  IF YOU RESIDE IN THE UNITED STATES, UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, YOU AGREE THAT ANY DISPUTE, CLAIM, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ALLEGED BREACH, TERMINATION, ENFORCEMENT, OR INTERPRETATION THEREOF, INCLUDING STATUTORY CONSUMER CLAIMS, OR TO THE USE OF THE SERVICE (TOGETHER, '**DISPUTES**') WILL BE SETTLED BY BINDING ARBITRATION, EXCEPT THAT EACH PARTY RETAINS THE RIGHT TO SEEK INJUNCTIVE OR OTHER EQUITABLE RELIEF IN A COURT OF COMPETENT JURISDICTION TO PREVENT THE ACTUAL OR THREATENED INFRINGEMENT, MISAPPROPRIATION, OR VIOLATION OF A PARTY'S COPYRIGHTS, TRADEMARKS, TRADE SECRETS, PATENTS, OR OTHER INTELLECTUAL PROPERTY RIGHTS.  YOU ACKNOWLEDGE AND AGREE THAT YOU ARE WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PROCEEDING.  UNLESS BOTH YOU PARTIES OTHERWISE AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF ANY CLASS OR REPRESENTATIVE PROCEEDING.
>
> ANY SUCH ARBITRATION SHALL BE INTIATED AND HELD IN THE OFFICE OF THE AAA IN LOS ANGELES, CALIFORNIA. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.
>
> NOTE THAT THIS AGREEMENT TO ARBITRATE CONSTITUTES A TRANSACTION IN INTERSTATE COMMERCE RENDERING THE INTERPRETATION AND ENFORCEMENT OF THIS PROVISION SUBJECT TO THE FEDERAL ARBITRATION ACT.  THIS ARBITRATOIN WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ('**AAA**') UNDER THE COMMERCIAL ARBITRATION RULES AND THE SUPPLEMENTARY PROCEDURES FOR CONSUMER RELATED DISPUTES (THE '**AAA RULES**') THEN IN EFFECT, EXCEPT AS MODIFIED BY THIS SECTION THE AAA RULES ARE AVAILABLE AT www.adr.org/arb_med OR BY CALLING THE AAA AT 1-800-788-7879.
>
> EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR

EXPERTS AND ATTORNEYS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INTIATED WITHIN ONE YEAR AFTER THE DISPUTE AROSE. THIS SECTION WILL SURVIVE ANY TERMINATION OF THIS AGREEMENT.

(Doc. No. 8-1, Ex. B at 13–14; *see also* Doc. No. 8-1, Ex. Ex. C at 21–22 (same, with the only difference being that the AAA website is listed as www.adr.og), Ex. D at 35–36 (same, with the only difference being that the AAA website is listed as www.adr.og).)

## III.    Standard of Review

When deciding a motion to compel arbitration, a court must first determine the applicable standard of review:  the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or the summary judgment standard under Federal Rule of Civil Procedure 56.  *See Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 772 (3d Cir. 2013).  "When it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay."  *Guidotti*, 716 F.3d at 776.  On the other hand, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability," after which the court should consider the motion under the Rule 56 summary judgment standard.  *Id.*; *see also Healthplan CRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 316 (W.D. Pa. 2020) (If "the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did, then resort to discovery and Rule 56 is proper." (cleaned up)).  "In the event that summary judgment

is not warranted because the party opposing arbitration can demonstrate . . . that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA [Federal Arbitration Act] envisions." *Guidotti*, 716 F.3d at 776 (cleaned up).

Checchia argues that the summary judgment standard applies.  (*See* Doc. No. 12 at 9 ("Here, the summary judgment standard applies because it is not apparent from the face of the complaint, that Plaintiff's claims are subject to arbitration, as Plaintiff disputes that a valid and enforceable arbitration agreement was formed.").)  SoLo never states whether it believes the Rule 12(b)(6) or Rule 56 standard apply in its briefing.  (*See* Doc. Nos. 8, 13.)  But at oral argument, SoLo indicated that the motion to dismiss standard should apply.  (May 23, 2023 Draft Hr'g Tr. at 8:2–22.)

Here, the Court concludes that the Rule 12(b)(6) standard governs because SoLo attached its Terms, which included an arbitration provision, to its motion to compel arbitration, as well as an affidavit explaining that a user must check off a box agreeing to the Terms and Conditions before creating a SoLo account, and Checchia failed to respond with additional *facts* sufficient to place the arbitration provision in issue.  *See Zabokritsky v. JetSmarter, Inc.*, Civil Action No. 19-273, 2019 WL 2563738, at *2 (E.D. Pa. June 20, 2019) ("Where the plaintiff fails to respond to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, the motion is considered under a Rule 12(b)(6) standard." (cleaned up)); *see also Parker v. Briad Wenco, LLC*, Civil Action No. 18-04860, 2019 WL 2521537, at *2 (E.D. Pa. May 14, 2019) ("If a party attaches an authentic arbitration agreement to a Motion to Compel arbitration, the Court must apply the Rule 12(b)(6) standard unless the plaintiff responds to a motion to

compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue." (cleaned up)).  *Cf. HealthplanCRM, LLC*, 458 F. Supp. 3d at 317 (applying Rule 12(b)(6) standard where the party opposing the motion to compel had "not presented evidence or otherwise identified any relevant category of information outside the record requiring the Court to pierce the pleadings in order to determine whether a valid arbitration agreement exist[ed]").

In his sur-reply, Checchia provided a bare-bones declaration that merely states that he did not recall either agreeing to the Terms or "seeing, reading, or being presented the Terms."  (Doc. No. 14-1.)  Checchia'a failure to recall whether he agreed to or was presented with and read the Terms is insufficient to place the arbitration provision in issue and trigger additional discovery. *Cf. Matthews v. Gucci*, Civil Action No. 21-434, 2022 WL 462406, at *4 (E.D. Pa. Feb. 15, 2022) ("Matthews did not provide an affidavit stating that she did not receive the MAA or that she did not sign the agreement.  Rather, during oral argument, her counsel merely argued that Matthews did not recall whether she signed the MAA.  But the inability of a nonmoving party to recollect whether she signed the agreement is insufficient to trigger additional discovery and the Rule 56 standard in and of itself.").  Moreover, Checchia never asks for additional discovery.

Further, Checchia's contention that a valid and enforceable arbitration agreement was not formed—and therefore the summary judgment standard applies (*see* Doc. No. 12 at 9)—is legal argument, not fact-based.  Whether a valid arbitration agreement exists here turns on a question of contract formation law.  Checchia does not dispute the facts set forth in SoLo's motion and affidavits, but rather disagrees with SoLo over how the Court should interpret those facts.  (*See, e.g.*, Doc. No. 12 at 12 (not disputing that Plaintiff clicked a box that stated, "I agree to SoLo's Terms & Conditions" but rather arguing that because those "words were not hyperlinked to the Terms" themselves and because the hyperlink provided referred to "Terms of Service" instead of

"Terms and Conditions," Plaintiff "did not unambiguously manifest his assent to the Terms"); *id.* at 11 & n.8 (admitting that the mobile app included a "Terms of Service" hyperlink but arguing that Plaintiff lacked notice of, and therefore did not assent to, the Terms because he was not asked whether he read the Terms or whether he had read and understood the Terms); May 23, 2023 Draft Hr'g Tr. at 27:7–10 ("The Court: Well, but, your client did click on the box that says, 'I accept the terms.' Mr. Abramowicz: Correct.").)

"The test in reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is whether, under any 'plausible' reading of the pleadings, the plaintiff would be entitled to relief." *Guidotti*, 716 F.3d at 772. "[I]f, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint," then a complaint should be dismissed under Rule 12(b)(6).[3] *Id.*; *see also id.* at 777 ("Under the Rule 12(b)(6) standard, there would be no reading of the complaint, no matter how friendly to [the plaintiff], that could rightly relieve her of the arbitration provision in the Account Agreement[.]").

## IV.   Discussion

"Because arbitration is a matter of contract, before compelling arbitration pursuant to the [FAA], a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that valid agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *see also Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313 (3d Cir. 2019). "To determine if there is a valid arbitration agreement, a court must 'apply ordinary state-law principles that govern the formation of contracts.'" *Hrapczynski v.*

---

[3] Even if the Court were to apply the Rule 56 standard, the end result (i.e., denial of this motion) would be the same. Plaintiffs' counsel reiterated during oral argument that he did not need discovery. (*See* May 23, 2023 Draft Hr'g Tr. at 29:7–9 ("[The Court]: Are you asking for discovery? Mr. Abramowicz: No, we are not.").)

*Bristlecone, Inc.*, Civil Action No. 20-cv-06014, 2021 WL 3209852, at *3 (E.D. Pa. July 29,

2021) (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017).

A choice of law analysis is necessary to determine whether Pennsylvania or California

law applies.[4]  This is a diversity case, so the Court applies the choice of law rules of the forum

state, Pennsylvania.  *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011) ("In an

action based on diversity of citizenship, a federal court generally applies the choice-of-law rules

of the jurisdiction in which it sits."); *see also Hrapczynski*, 2021 WL 3209852, at *4.

The Third Circuit has described Pennsylvania's choice of law analysis as containing three

steps.  First, we must determine whether there is an actual conflict between the laws of the

relevant states.  *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("[T]he first

part of the choice of law inquiry is best understood as determining if there is an actual or real

conflict between the potentially applicable laws.").  "If two jurisdictions' laws are the same, then

there is no conflict at all, and a choice of law analysis is unnecessary."  *See id.*; *see also Budtel*

*Assoc., L.P. v. Cont'l Cas. Co.*, 915 A.2d 640, 641 (Pa. Super. Ct. 2006) ("If no conflict exists,

further analysis is unnecessary.  If a conflict is found, it must be determined which state has the

greater interest in the application of its law.").  "Second, if there is a conflict in the law, then a

court should examine the governmental policies underlying each law, and classify the conflict as

a 'true,' 'false,' or an 'unprovided-for' situation."  *Hrapczynski*, 2021 WL 3209852, at *4

(internal quotation marks and citations omitted).  "Third, if a true conflict exists, the Court must

then determine which state has the greater interest in the application of its law."  *Id.* (cleaned up).

---

[4] SoLo is located in California, and Checchia lives in Pennsylvania. (Compl. at ¶¶ 5–6.) The Court notes
that all three sets of SoLo's Terms and Conditions contained a governing law provision, which states that
the "Agreement is governed by California law without regard to its conflicts of law rules[.]"  (*See* Doc.
No. 8-1, Ex. B at 13, Ex. C at 21, Ex. D at 34.)

Here, the parties agree that there is no actual conflict between the laws of California and Pennsylvania with respect to contract formation, rendering it unnecessary to do any choice of law analysis.  (*See* Doc. No. 8 at 19 ("[T]he Arbitration Agreement is enforceable regardless of whether California or Pennsylvania law applies."); Doc. No. 12 at 10 n.4 ("These rules require avoiding the choice of law question if the laws at issue produce the same result.  Because Pennsylvania and California law both require mutual assent to form a contract, there is no conflict here." (cleaned up); May 23, 2023 Draft Hr'g Tr. at 11:20–21 ("[B]ecause the fundamental principals [sic] are the same, I don't think there is a conflict that impacts the issue.").)  *See also Hrapczynski*, 2021 WL 3209852, at *4 ("The parties concede that there is no 'actual' conflict between the laws of California and Pennsylvania regarding contract formation. As Bristlecone states, 'whether Pennsylvania or California law applies, *the result is the same*. Hrapczynski also recognizes, 'there is no conflict between Pennsylvania and California law on the issue of contract formation – the analyses proceed identically.'  Thus, it is unnecessary to do any further choice of law analysis.").  *Cf. Azer Scientific Inc. v. Quidel Corp.*, Civil No. 5:21-cv-02972-JMG, 2021 WL 5918655, at *4 n.2 (E.D. Pa. Dec. 15, 2021) ("Before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law.  Where there is no conflict, the court should avoid the choice of law issue.  Here, the Court finds no conflict between Pennsylvania and California law regarding contract formation. Accordingly, we need not resolve the conflict-of-law issue." (cleaned up)).

Because the parties agree that there is no actual conflict, the Court will apply Pennsylvania and California law interchangeably.  *See Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law.  If there is no conflict, then the district court sitting in

diversity may refer interchangeably to the laws of the states whose laws potentially apply."); *Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 512 n.4 (E.D. Pa. 2021) ("Pennsylvania choice of law rules first ask if there is an 'actual conflict' between the laws of the two states.  When there is no conflict, cases can be cited interchangeably or Pennsylvania law may be applied."  (cleaned up)).

* * *

The Court now considers whether a valid agreement to arbitrate exists.  To form a contract under both California and Pennsylvania law, the parties must manifest mutual assent. *See Snow v. Eventbrite, Inc.*, Case No. 3:20-cv-03698-WHO, 2021 WL 3931995, at *2 (N.D. Cal. Sept. 2, 2021) ("Under California law, a valid contract requires the mutual consent of the parties[.]"); *Zabokritsky*, 2019 WL 2563738, at *3 ("Under Pennsylvania law, the elements of an agreement are: (1) both parties must manifest an intention to be bound by the agreement; (2) the terms of the agreement must be sufficiently definite; and (3) there must be consideration." (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)).  An Internet-based agreement to arbitrate is enforceable where (1) notice of the agreement is reasonably conspicuous and (2) manifestation of assent is unambiguous.  *See Oberstein v. Live Nation Ent'mt, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) ("[A]n enforceable agreement may be found where '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his assent to those terms.'" (quoting *Berman v. Freedom Fin. Network*, 30 F.4th 849 (9th Cir. 2022))); *see also HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 ("[T]he Court may determine that a web-based agreement to arbitrate exists where notice of the agreement was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." (cleaned

15

up)).

There are two primary types of Internet-based contracts: "clickwrap" agreements and "browsewrap" agreements.  *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 736 F.3d 1171, 1175–76 (9th Cir. 2014).  Clickwrap agreements arise when "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed."  *Oberstein*, 60 F.4th at 513 (cleaned up); *see also Snow*, 2021 WL 3931995, at *3 ("Clickwrap (or click-through) agreements require a website's users to click on an 'I agree' box after being presented with a list of terms and conditions of use." (cleaned up)).  Courts routinely enforce clickwrap agreements.  *Oberstein*, 60 F.4th at 513; *HealthplanCRM, LLC*, 458 F. Supp. 3d at 334; *see also Berman*, 30 F.4th at 856 ("In [the clickwrap] scenario, the consumer has received notice of the terms being offered, and in the words of the Restatement, knows or has reason to know that the other party may infer from his conduct that he assents to those terms.  As a result, courts have routinely found clickwrap agreements enforceable." (cleaned up)); *Dobbs v. Health IQ Ins. Servs., Inc.*, Civil Action No. 21-5236, 2022 WL 2974713, at *4 (E.D. Pa. July 27, 2022) ("[C]ourts have held that 'clickwrap' agreements manifest sufficient agreement to the terms in the contract.").

In contrast, courts are "generally more reluctant to enforce browsewrap agreements," *Brooks v. IT Works Mktg., Inc.*, No. 1:21-cv-01341-DAD-BAK, 2022 WL 2079747, at *5 (E.D. Cal. June 9, 2022),  in which "a website's terms and conditions of use are generally posted on a website via hyperlink at the bottom of the screen," *Lee v. Ticketmaster LLC*, 817 F. App'x 383, 394 (9th Cir. 2020) (quoting *Nguyen*, 763 F.3d at 1175–76); *see also HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 ("In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen.  However, unlike online

agreements where users must click on an acceptance after being presented with terms and conditions (known as 'clickwrap' agreements), browsewrap agreements do not require users to manifestly express assent.").

Not all Internet-based contracts fall neatly into the "clickwrap" or "browsewrap" categories, however. *See, e.g.*, *Oberstein*, 60 F.4th at 515 ("Appellees' Terms are not pure clickwrap because they do not, upon some user action, request that users click on a box to confirm agreement before proceeding.  Nor are they pure browsewrap, as they are not hidden in links located at the bottom of webpages.  Rather, they lie somewhere in between."); *Brooks*, 2022 WL 2079747, at *5 ("These two categories of Internet contracts fall on two ends of a spectrum . . . Often websites present some hybrid of the two, such as putting a link to the terms of the agreement on the page, sometimes near a button the user must click to continue." (cleaned up)); *see also Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023) ("[T]he Terms of Use Agreement is somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click 'Create Your Account'— to assent to the hyperlinked terms." (cleaned up)); *Williams v. DDR Media, LLC*, Case No. 22-cv-03789-SI, 2023 WL 2314868, at *3 (N.D. Cal. Feb. 28, 2023) ("The agreement here falls somewhere between a clickwrap and a browsewrap agreement.  A user is not required to click an 'I agree' button after being shown the website's Terms and Conditions, but the website does inform users that if they click a button (the 'Get Started' button), they agree to the Terms of Use."); *Regan v. Pinger, Inc.*, Case No. 20-CV-02221-LHK, 2021 WL 706465, at *5–6 (N.D. Cal. Feb. 23, 2021) (finding that the agreement was "somewhere between a pure clickwrap and a pure browsewrap agreement" where the users of the Sideline App were "not forced to actually

read the [Terms of Service] before assenting to them"—unlike a "pure-form clickwrap

agreement, [where] users typically click an 'I agree' box after being presented with a list of

terms and conditions of use"—and instead clicked buttons for actions like "Create Account,"

"For Personal Use," or "Login," which "did not explicitly reference the [Terms of Service]"

(cleaned up)).

SoLo maintains that the agreement between SoLo and Checchia is a clickwrap agreement

because Checchia had to click a button stating "I agree to SoLo's Terms & Conditions" to

proceed.  (*See* Doc. No. 8 at 20.)  As noted above, a clickwrap agreement exists when a user is

presented with the contractual terms before having to affirmatively assent to those conditions—

but it is not obvious that was the case here.  Even though Checchia did have to click the "I agree

to SoLo's Terms & Conditions" button to create his SoLo account (and could not have accessed

SoLo's product and/or services otherwise), there is no indication that the Terms were presented

to Checchia beforehand, such as on a pop-up screen.  Moreover, the phrase "Terms &

Conditions" was *not* hyperlinked, which distinguishes this case from others in which courts have

found clickwrap agreements exist.[5]  *See, e.g.*, *Berman*, 30 F.4th at 856 ("The most

straightforward application of these principles in the online world involves so-called 'clickwrap'

agreements, in which a website presents users with specified contractual terms on a pop-up

screen and users must check a box explicitly stating 'I agree' in order to proceed.").  *Contra*

*Treinish v. iFit Inc.*, Case No. CV 22-4687-DMG (SKx), 2023 WL 2230431, at *2, *4 (C.D. Cal.

---

[5] SoLo's counsel admitted during oral argument that he was unable to find a case directly on point and that this case involves a unique fact pattern.  (*See* May 23, 2023 Hr'g Tr. at 14:6–12 ("I don't think any of the cases cited by plaintiffs – and frankly, I don't think I found any directly on point either – addressed the context of clicking something that says 'I agree to certain terms.'  There being a name mismatch.  It being linked but not being linked in the 'I agree' button.  So it's kind of a unique situation in that regard.").)

Feb. 2, 2023) (finding a clickwrap agreement existed because "[t]o create an iFIT account, the user must check a box next to the message: 'I have read and agree to iFIT's Terms of Use and Privacy Policy,' with 'Terms of Use' and 'Privacy Policy' written in blue, underscored, and hyperlinked text"); *Navarro v. SmileDirectClub, Inc.*, Case No. 22-cv-00095, 2022 WL 1786582, at *3–4 (N.D. Cal. June 1, 2022) (finding a clickwrap agreement existed because to create an account, the user had to check a box that said "I agree to SmileDirect Club's Informed Consent and Terms & SmilePay Conditions" where "Terms" and "SmilePay Conditions" were each blue hyperlinks); *Alfia v. Coinbase Global, Inc.*, Case No. 21-cv-08689-HSG, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) ("[T]o create his Coinbase-account, Plaintiff had to click a 'check box' next to the language 'I certify that I am 18 years of age or older, and I agree to the User Agreement and Privacy Policy,' with both agreements accessible via hyperlink . . . Plaintiff's assent was similar to a 'clickwrap' agreement—he clicked a box stating that he agreed to the User Agreement, which was hyperlinked for easy accessibility."); *Zabokritsky*, 2019 WL 2563738, at *3, *5 (finding a clickwrap agreement existed where the mobile app user had to slide a button "I agree to Terms of Use" and the words "Terms of Use" were a red hyperlink that led to the Terms of Service); *Gambo v. Lyft, Inc.*, -- F. Supp. 3d --, Civil Action No. 22-1726 (RDM), 2022 WL 16961132, at *1 (D.D.C. Nov. 16, 2022) (finding a clickwrap agreement existed where the "user was required to click on a box representing that he understood and agreed to the Terms of Service, and those Terms of Service were accessible by merely clicking on the highlighted [hyper]link appearing in that same sentence").  For these reasons, the Court finds that the agreement here also "lie[s] somewhere in between" a clickwrap and browsewrap agreement.  *Oberstein*, 60 F.4th at 515.

Next, the Court considers whether Checchia had notice of, and manifested assent to,

SoLo's Terms.  Because SoLo has not provided any proof that Checchia had actual notice of

SoLo's Terms, the Court considers only whether Checchia had constructive, or inquiry, notice of

the Terms.  This requires us to determine whether the notice was reasonably conspicuous.  *See*

*Berman*, 30 F.4th at 856 ("Unless the website operator can show that a consumer has actual

knowledge of the agreement, an enforceable contract will be found based on an inquiry notice

theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the

consumer will be found; and (2) the consumer takes some action, such as clicking a button or

checking a box, that unambiguously manifests his or her assent to those terms."); *Brooks*, 2022

WL 2079747, at \*6 ("[D]efendants have not shown that plaintiff had actual notice of the Terms

of Use and can proceed only on an inquiry or constructive notice theory of contract formation . . .

To establish that plaintiff had inquiry notice of the Terms of Use, defendants must first show that

the It Works! Website 'provides reasonably conspicuous notice of the terms to which the

consumer will be bound.'" (citation omitted)).  To be reasonably conspicuous, "a notice must be

displayed in a font size and format such that the court can fairly assume that a reasonably

prudent Internet user would have seen it." *Berman*, 30 F.4th at 856.  Moreover, "while it is

permissible to disclose terms and conditions in a hyperlink, the fact that a hyperlink is present

must be readily apparent." *Id.* at 857.  Neither of those requirements is met here.

　　　As noted above, before being able to click "Looks Good, Let's Go" and proceed with

creating an account, a SoLo user must click a button that says "I agree to SoLo's Terms &

Conditions." (*See* Doc. No. 8-1 at 7.)  Significantly, "Terms & Conditions" is *not* hyperlinked to

the Terms, nor does it appear in any special color, font, or format.  (*See id.*)  Further, "Terms of

Service" (which SoLo avers is hyperlinked and leads to its Terms) appears about seven lines

above the "I agree" checkbox.  (*See id.*)  In other words, the actual hyperlinked "Terms of

Service" is not in close proximity to the "I agree" checkbox.

In addition, "Terms of Service" appears in a blueish-green color and is not underlined or capitalized.  (*See id.*)  It is also the same exact font size and color as the five lines that appear directly beneath it, which include: "Privacy Policy," "E-Sign Disclosure," "SynapseFi's Terms of Service," "SynapseFi's Privacy Policy," and "Evolve's Deposit Agreement."  (*See id.*)  It is also approximately the same font size as the "The SSN I entered is my own" and "I agree to SoLo's Terms & Conditions" checkboxes that follow.  (*See id.*)

Ultimately, "Terms of Service" is devoid of features to set it apart from the surrounding text; as noted, it lacks the traditional indicia of hyperlinks, such as underlines and capitalization, and it is the same color as the text that immediately follows it for the next five lines.  *Cf. Berman*, 30 F.4th at 847 ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text.  Customary design elements denoting the existence of a hyperlink include the use of contrasting color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.").  "Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'"  *Id.* (citation omitted).

And, critically, there is nothing indicating that the "Terms of Service" are in fact "SoLo'sTerms & Conditions" to which the user is agreeing when clicking the "I agree" checkbox.[6]  Again, they were not situated near one another; the "Terms of Service" hyperlink did

---

[6] During oral argument, SoLo's counsel cited to *Meyer v. Uber Tech., Inc.*, 868 F.3d 66 (2d Cir. 2017) to support its position that the terms "Terms of Service" and "Terms & Conditions" are interchangeable. (May 23, 2023 Draft Hr'g Tr. at 6:22–11.)  But *Meyer* is distinguishable because, in that case, the Terms of Service was hyperlinked to the Terms and Conditions.  *See id.* at 78 (finding notice was reasonably conspicuous in a mobile app where there was a warning by the registration button that stated, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" and the text,

not appear immediately above or below the "I agree" checkbox. And to heighten the confusion, the "Terms of Service" hyperlink had no identifier (i.e., was not labeled as "SoLo's Terms of Service") and was not even the only "Terms of Service" that appeared on the page; indeed, "SynapseFi's Terms of Service" was also located a few lines above the "I agree" checkbox.

For these reasons, the Court concludes that notice was not reasonably conspicuous and that Checchia did not manifest assent to the arbitration agreement. *Contra Oberstein*, 60 F.4th 516 ("We agree with the district court that a reasonable user would have seen the notice and been able to locate the Terms via hyperlink. Appellees' notice is conspicuously displayed directly above or below the action button at each of three independent stages that a user must complete before purchasing tickets. The language 'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes that continued use will act as a manifestation of intent to be bound. And, crucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent." (cleaned up)); *Moule v. United Parcel Serv. Co.*, Case No.: 1:16-cv-00102-JLT, 2016 WL 3648961, at *5 (E.D. Cal. July 7, 2016) ("[T]he UPS shipper was informed: 'By clicking the Yes button, you agree to the UPS Tariff/Terms and Conditions.' In addition, immediately below this statement, and above the 'Yes' button, a hyperlink to the 'Terms and Conditions' was provided. Because it is undisputed that Plaintiff had the opportunity to view the Terms and Conditions and clicked the 'Yes' button to process the shipment, the Court finds Plaintiff manifested assent to the UPS Terms when arranging the shipment at issue.").

---

"including the hyperlinks to the Terms and Conditions and Privacy policy, appear[ed] directly below the buttons for registration").

In addition, as noted *supra* n.5, SoLo's counsel admitted during oral argument that this case involves a unique fact pattern.

Last, the Court notes that it is wholly unpersuaded by SoLo's contention that each of Checchia's nineteen Loan Agreements incorporated by reference SoLo's Terms and that Checchia manifested his assent to the Terms by entering into those Agreements.  (*See* Doc. No. 8 at 21 & n.34.)  The sole case SoLo relies upon to support its position, *In re Estate of Atkinson*, 231 A.3d 891 (Pa. Super. Ct. 2020), is inapposite, as that case involved a very explicit incorporation by reference provision.  *See id.* at 894–895 (explaining that the Trustee had to complete and sign an application to open a Brady CAP Account, which included an explicit provision, "I have reviewed and read the accompanying CAP ACCOUNT CUSTOMER AGREEMENT (the 'CAP Agreement'), including the documents incorporated by reference in the CAP Agreement and agree to be bound by the terms and conditions contained therein" and that immediately above the Trustee's signature, the Brady CAP account application stated in bold font and all capital letters "THE CAP AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE.  BY SIGNING THIS APPLICATION, I ACKNOLWEDGE RECEIPT OF A COPY OF THE AGREEMENT CONTAINING SUCH CLAUSE").  In contrast, the Loan Agreements do not expressly incorporate by reference SoLo's Terms.  Rather, they merely state in the Default provision, "Borrower may be deemed in default (each, an 'Event of Default') of Borrower's obligations under this Note if Borrower . . . (4) fails to abide by the terms of this Note or the SoLo Terms and Conditions."  (*See, e.g.*, Doc. No. 8-2, Ex. A at 7 (February 28, 2022 Loan Agreement).)  This is woefully insufficient.

\* \* \*

For these reasons, the Court finds that SoLo has failed to show that a valid arbitration agreement exists and denies SoLo's motion to compel arbitration.[7]

---

[7] Because SoLo has failed to show that a valid arbitration agreement exists, the Court does not address

## V.    Conclusion

For the foregoing reasons, the Court denies SoLo's motion to compel arbitration.

An appropriate Order follows.

---

Checchia's remaining arguments as to the delegation clause and unconscionability.