**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN CHECCHIA**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 23-444-KSM** |
| **SOLO FUNDS, INC.**, | |
| Defendant. | |

**MEMORANDUM**

**MARSTON, J.**                                                          **March 21, 2025**

Plaintiff Steven Checchia, individually and on behalf of a putative class, brings this action against Defendant SoLo Funds, Inc. ("SoLo") for violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Loan Interest and Protection Law ("LIPL"), and Consumer Discount Company Act ("CDCA"). (Doc. No. 1-2.) SoLo has moved to compel Checchia to arbitrate his claims, arguing that when Checchia created his SoLo account, he agreed to SoLo's terms and conditions, which contained an arbitration provision (Doc. No. 40). Checchia opposes the motion, arguing that SoLo has not shown there was a valid agreement to arbitrate. (Doc. No. 41.) For the reasons discussed below, the Court grants SoLo's motion.

## I.    BACKGROUND[1]

SoLo operates an online platform that "connects third-parties seeking to borrow money . . . with third-parties offering to lend money." (Doc. No. 40-9 at 3.) This platform is

---

[1] As discussed below, the Court considers SoLo's motion under the standard applicable to motions for summary judgment. Accordingly, the facts in this section are taken from the evidentiary record and viewed in the light most favorable to Checchia as the nonmovant.

accessible online at www.solofunds.com and via a mobile application. (*Id.* at 3.) To borrow money through the platform, a user must first create an account. (*Id.* at 4.) On February 26, 2022, Checchia created a SoLo account using version 2.52 of SoLo's iPhone app. (*Id.* at 3.) At that time, it was not possible to sign up for an account through SoLo's website, nor was it possible to request a loan through the website. (Doc. No. 40-10 at 3–4.) It is necessary to describe that sign-up process in some detail.[2]

### A.    SoLo's App

After downloading the app, a user in February 2022, like Checchia, would have been prompted to sign up using a pre-existing Apple, Facebook, or Google account. (*See id.* at 12; Video at 00:04.) In small grey lettering underneath these options was the phrase "Terms & Conditions," which served as a hyperlink to SoLo's "Terms"[3]:

---

[2] SoLo does not maintain videos reflecting each user's movements through its app, so it has no record of Checchia's specific interactions. (Doc. No. 40-9 at 4.) But SoLo is capable of reverting the app to a historic version, in this case, version 2.52, which would reflect the sign-up process for the average user who used that version of the app. (*Id.*) Here, SoLo has submitted a screen recording, which shows what the average user would have seen when using version 2.52 of the app on an iPhone in February 2022. (*See* Screen Recording of Sign-Up Process for Mobile Application Version 2.52 (SoLo) (on file with Chambers) (the "Video").) Checchia does not argue that his interaction differed from the average experience as reflected in this recording. *See Dhruva v. CuriosityStream, Inc.*, __ F.4th __, No. 24-1080, 2025 WL 748138, at *1 (4th Cir. Mar. 10, 2025) (considering evidence showing the "website's three-part sign-up process" because the plaintiffs "offered no evidence challenging [the defendant's] representations about how the sign-up pages looked during the relevant times"). Accordingly, the Court relies on the screen recording and uses screenshots from that recording when describing the sign up-process.

[3] In the screen recording, the hyperlink takes the user to a page labeled "Terms of Service," which says "Revised: December 23, 2024." (Video at 00:09.) SoLo's Director of Product Eduardo Munoz explained that this page reflects "the version of the Terms as they appeared at the URL at the time the" screen recording was created, and not the version of SoLo's terms and conditions that was in effect in February 2022. (Doc. No. 40-9 at 4–5.) This disconnect occurs because "[r]everting the Mobile Application to the version seen by Checchia at the time he signed-up does not alter what is available through the URL." (*Id.* at 5.) In other words, although the screen recording shows the version of the app used by Checchia, the hyperlinks still take the user to the *current* iteration of SoLo's terms and conditions, not the iteration that would have been available to Checchia in February 2022. A copy of the historic terms and conditions, titled simply, "Terms," is attached to Munoz's declaration, and an image of the first page is included here. (*Id.* at 21–27 ("Last Updated: May 2020").)

 

(Doc. No. 40-9 at 12, 21; Video at 00:04–00:09.)  The user did not have to click on the hyperlink to move forward in the sign-up process.

Once the user linked their Apple, Facebook, or Google account, they were taken to a new page, which prompted them to enter their phone number into a text entry box.  (Video at 00:37.) In the top right corner of this page was the phrase "Get help" in dark teal lettering, which hyperlinked to a new page that said, "Need more help?" and allowed the user to see answers to frequently asked questions or to submit a "Ticket" for assistance.  (*Id.* at 00:37–00:46.) Underneath "Get help" and the text entry box was a faded teal rectangle with the words "Send SMS Verification."  (*Id.* at 00:37.)  Once the user entered their phone number into the text entry box, this rectangle turned the same dark teal as the "Get help" phrase, and the user was able to click on it:



(*Id.* at 00:37–1:00; Doc. No. 49-1 at 14.)

The next page was labeled "Keep An Eye Out." (Video at 1:00.) The "Get help" hyperlink remained in the top right corner in dark teal. (*Id.*) In the center of the page was a text entry box where the user could enter the code that SoLo sent to their phone. (*Id.*) Underneath this box was the phrase, "Didn't get a code? Resend." in dark teal. (*Id.*) As with the other dark teal phrases, it was a hyperlink, and once clicked, it opened a popup that said, "We have sent you another code," with the clickable, dark teal, phrase "Got it" underneath. (*Id.* at 1:00–1:06.)

 

(*Id.* at 1:00–1:06; Doc. No. 40-9 at 14.)

After the user entered the verification code, they were taken to a new page titled, "ID Verification (Front)."  (Video at 1:22.)  The "Get help" hyperlink remained in the top right corner in dark teal.  (*Id.*)  In the center of the page, SoLo included directions for how a user could take a photo of their driver's license, which SoLo would then use to auto populate the user's basic information into a later portion of the application.  (*Id.*; *see also* Doc. No. 41-1, Munoz Depo. Tr., at 14:8–23.)  Underneath these directions was the phrase "Learn more about ID verification" in dark teal, which was a hyperlink that opened a separate page, which discussed the purpose of ID verification and provided another dark teal link, this time to SoLo's "Privacy Policy."  (Video at 1:22–1:40.)  When the user returned to the main ID verification page, underneath the directions, in a dark teal rectangle, were the words "Take Photo of Front of ID," which the user selected to open the camera app and take a photo.  (*Id.* at 1:40–1:54.)  The user then went through the same process to take a photo of the barcode on the back of the license. (*Id.* at 1:54–2:12.)

  

(Doc. No. 40-9 at 15–17; Video at 1:22–2:12.)

Once the photos were submitted, the user was taken to a page labeled "Last Step!" (Doc. No. 40-9 at 18.) Some of the information, like name and date of birth, were pre-filled based on the photos taken of the user's ID. (*Id.*) The user was required to fill in the remaining information, including their street address and social security number. (*Id.*) Once inputted, the user scrolled down to reveal light grey text, which indicated the user was agreeing that, among other things, the "Social Security Number [they] provided [wa]s correct" and they were "a U.S. citizen or U.S. person." (Video at 2:19.) The grey text was not hyperlinked.

 

(Doc. No. 40-9 at 18–19.)

As these photos show, however, underneath the grey lettering were six phrases in dark teal: (1) "Terms of Service," (2) "Privacy Policy," (3) "E-Sign Disclosure," (4) "SynapseFi's Terms of Service," (5) "SynapseFi's Privacy Policy," and (6) "Evolve's Deposit Agreement." (Doc. No. 40-9 at 19; Video at 2:12–2:22.) Each phrase hyperlinked to a document. (Video at 2:22–3:41.) As relevant here, the phrase "Terms of Service" linked to the same "Terms"

document as the "Terms & Conditions" hyperlink included on the first screen of the sign-up process.  (Video at 2:22–2:50.)

Underneath the hyperlinks were two checkboxes, one next to the phrase, "The SSN I entered is my own," and the other next to the phrase, "I agree to SoLo's Terms & Conditions." (*Id*. at 3:44.)  Once both boxes were checked, the faded teal box labeled "Looks Good, Let's Go," turned to dark teal and could be clicked.  (*Id.* at 3:43–3:44.)  This completed the sign-up process, and the user could use the app to request loans.  (*Id.* at 3:49–4:02.)

\* \* \*

Checchia does not recall going through this sign-up process, reviewing SoLo's Terms, or checking the boxes on the last screen.  (Doc. No. 40-7, Checchia Depo. Tr., at 23:19–23, 25:14–26:5, 27:7–14, 32:4–8, 34:17–19, 47:10–12.)

## B.    SoLo's Terms

As noted above, if Checchia had clicked either the grey "Terms & Conditions" link on the first page or the dark teal "Terms of Service" link on the last page, he would have been taken to a document titled "Terms," which outlined SoLo's then-terms and conditions.  (Doc. No. 40-9 at 21–27.)  On the first page of SoLo's Terms, in bold, capitalized lettering is a notice that the agreement contains an arbitration provision:

> **THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION THAT AUTHORIZES EITHER PARTY TO ELECT MANDATORY AND BINDING ARBITRATION OF CERTAIN DISPUTES WHERE PERMTITED BY LAW. THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN THE SECTION ENTITLED 'RESOLUTION OF DISPUTES BY ARBITRATION.' PLEASE READ THE ARBITRATION PROVISION CAREFULLY.**

(*Id.* at 21.)  And a few pages later, the arbitration provision itself states in capitalized letters:

> *DISPUTE RESOLUTION.*  IF YOU RESIDE IN THE UNITED STATES, UNLESS OTHERWISE SPECIFIED BY APPLICABLE LAW, YOU AGREE

7

THAT ANY DISPUTE, CLAIM, OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ALLEGED BREACH, TERMINATION, ENFORCEMENT, OR INTERPRETATION THEREOF, INCLUDING STATUTORY CONSUMER CLAIMS, OR TO THE USE OF THE SERVICE (TOGETHER, '**DISPUTES'**) WILL BE SETTLED BY BINDING ARBITRATION, EXCEPT THAT EACH PARTY RETAINS THE RIGHT TO SEEK INJUNCTIVE OR OTHER EQUITABLE RELIEF IN A COURT OF COMPETENT JURISDICTION TO PREVENT THE ACTUAL OR THREATENED INFRINGEMENT, MISAPPROPRIATION, OR VIOLATION OF A PARTY'S COPYRIGHTS, TRADEMARKS, TRADE SECRETS, PATENTS, OR OTHER INTELLECTUAL PROPERTY RIGHTS. YOU ACKNOWLEDGE AND AGREE THAT YOU ARE WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PROCEEDING. UNLESS BOTH YOU PARTIES OTHERWISE AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF ANY CLASS OR REPRESENTATIVE PROCEEDING.

ANY SUCH ARBITRATION SHALL BE INTIATED AND HELD IN THE OFFICE OF THE AAA IN LOS ANGELES, CALIFORNIA. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

NOTE THAT THIS AGREEMENT TO ARBITRATE CONSTITUTES A TRANSACTION IN INTERSTATE COMMERCE RENDERING THE INTERPRETATION AND ENFORCEMENT OF THIS PROVISION SUBJECT TO THE FEDERAL ARBITRATION ACT. THIS ARBITRATOIN WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ('**AAA'**) UNDER THE COMMERCIAL ARBITRATION RULES AND THE SUPPLEMENTARY PROCEDURES FOR CONSUMER RELATED DISPUTES (THE '**AAA RULES**') THEN IN EFFECT, EXCEPT AS MODIFIED BY THIS SECTION THE AAA RULES ARE AVAILABLE AT www.adr.org/arb_med OR BY CALLING THE AAA AT 1-800-788-7879.

EACH PARTY SHALL BEAR ITS OWN COSTS AND FEES FOR EXPERTS AND ATTORNEYS. THIS EXCLUSIVE ARBITRATION REMEDY SHALL NOT BE AVAILABLE UNLESS INTIATED WITHIN ONE YEAR AFTER THE DISPUTE AROSE. THIS SECTION WILL SURVIVE ANY TERMINATION OF THIS AGREEMENT.

(*Id.* at 25–26.)

C.    **Checchia's Loans**

After signing up for the SoLo app on February 26, 2022, Checchia contracted for 19 loans using SoLo's app, for a combined total amount of $6,175.  (Doc. No. 40-6 at 4–6.[4])  Each loan had a corresponding Loan Agreement and Promissory Note (*id.* at 6), which referenced SoLo's Terms and Conditions in the section titled "Default":  "Borrower may be deemed in default" if the Borrower "fails to abide by the terms of this Note or the SoLo Terms and Conditions" (*see, e.g.*, *id.* at 47–48).  This section did not include a hyperlink to SoLo's Terms, nor did it explain where the borrower could find a copy of the Terms.  (*See generally id.*)

II.    **PROCEDURAL HISTORY**

Checchia filed this putative class action against SoLo on December 30, 2022 in the Philadelphia County Court of Common Pleas.  (Doc. No. 1-2.)  His allegations are discussed at length in this Court's prior Memorandum, *see Checchia v. SoLo Funds*, Civil Action No. 23-444-KSM, 2023 WL 3868369, at *1 (E.D. Pa. June 7, 2023), so we do not repeat them in full here.  In short, Checchia alleges that SoLo "misrepresents that its advances [i.e., the loans] cost nothing" to consumers, when in truth, users are required to pay "tips" and "donations" to receive a loan.  (Doc. No. 1-2 at ¶ 24; *see also id.* at ¶¶ 25–26, 60, 68–69.)  He claims that SoLo's

_____

[4] Doc. No. 4-6 is the declaration of SoLo's Director of Analytics, Sabrina Carlson.  Checchia argues that the Court cannot rely on this document because during discovery, SoLo failed to disclose Carlson as someone who "may provide testimony concerning any motion to compel arbitration."  (Doc. No. 41 at 10.)  For two reasons the Court declines to wade into the depths of the parties' dispute about the Carlson Declaration and accompanying exhibits.  First, the Court references the Carlson declaration only to the extent it provides the same information previously disclosed to Checchia through the declaration of Albert Wildeman, which SoLo submitted in support of its initial motion to compel.  (*See* Doc. No. 8-2 at 2–4.)  Thus, even if the Carlson declaration is untimely, Checchia is not prejudiced by this portion of the declaration.  Second, although the Court references Checchia's loans and the Carlson's declaration here, we ultimately find, for the reasons discussed later in this Memorandum, that we need not consider the loan agreements to find Checchia had inquiry notice of SoLo's Terms.  Because the declaration is immaterial to the Court's holding, the Court need not consider the alleged procedural defects in its disclosure.

actions amount to violations of Pennsylvania's UTPCPL, LIPL, and CDCA.  (*Id.* at pp. 15–17.)
And he seeks to certify a class comprised of "[a]ll Pennsylvania residents who obtained an
advance or loan through the Solo app and paid a 'tip,' 'donation,' late fee, synapse fee, recovery
fee, or any other interest, fee, charge, or cost."  (*Id.* at ¶ 88.)

SoLo removed the matter to this Court on February 3, 2023, and one month later, moved
to compel arbitration and dismiss Checchia's Complaint.  (Doc. No. 8.)  Checchia opposed the
motion.  (Doc. No. 12.)  After oral argument, the Court declined to compel arbitration, finding
that the Rule 12(b)(6) standard governed and concluding "that notice [of the arbitration clause]
was not reasonably conspicuous and that Checchia did not manifest assent to the arbitration
agreement."  (Doc. No. 21 at 10, 22); *see also Checchia*, 2023 WL 3868369, at *5, 10.

SoLo appealed (Doc. No. 25), and on August 8, 2024, the Third Circuit vacated this
Court's ruling and remanded the matter "so that the parties may conduct limited discovery on
factual questions necessary to determine whether an agreement to arbitrate was properly
formed." *See Checchia v. SoLo Funds, Inc.*, No. 23-2193, 2024 WL 3717491, at *1 (3d Cir. Aug.
8, 2024).  The Third Circuit explained that because this Court "relied upon documents outside of
the pleadings" the motion to compel should have been decided "under the summary judgment
standard," not the motion to dismiss standard.  *Id*. at *2.  And given the "underdeveloped" nature
of the record, this Court should have given both parties the "right to further develop that
evidence via formal discovery" before deciding "whether an agreement to arbitrate was properly
formed."  *Id.* at *3.

On remand, this Court directed that all "arbitration-related discovery . . . be completed no
later than December 6, 2024."  (Doc. No. 34 at 1.)  That discovery is now complete, and SoLo

has renewed its motion to compel arbitration.  (Doc. No. 40.)  Checchia once again opposes the

motion.  (Doc. No. 41.)

### III.    STANDARD OF REVIEW

When deciding a motion to compel arbitration, a court must first determine the applicable

standard of review:  the motion to dismiss standard under Federal Rule of Civil Procedure

12(b)(6) or the summary judgment standard under Federal Rule of Civil Procedure 56.  *See Silfee*

*v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *Guidotti v. Legal*

*Helpers Debt Resol., LLC*, 716 F.3d 764, 772 (3d Cir. 2013).  The Third Circuit has clarified that

the summary judgment standard applies in this case.  *Checchia*, 2024 WL 3717491, at *2.

Summary judgment is appropriate when the "materials in the record," show that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable

jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the

outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the

judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the

inferences to be drawn from the underlying facts must be viewed in the light most favorable to

the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (quotation marks and alterations omitted).

"The party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Keebaugh v. Warner Bros. Entertainment, Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024) (quotation marks omitted); *accord Dhruva*, 2025 WL 748138, at *2. "In the event that summary judgment is not warranted because the party opposing arbitration can demonstrate . . . that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA [Federal Arbitration Act] envisions." *Guidotti*, 716 F.3d at 776 (cleaned up).

## IV.    DISCUSSION

"The Federal Arbitration Act (FAA) requires district courts to compel arbitration of claims covered by an enforceable arbitration agreement." *Berman v. Freedom Fin. Network*, 30 F.4th 849, 855 (9th Cir. 2022) (citing 9 U.S.C. § 3). "Because arbitration is a matter of contract, before compelling arbitration pursuant to the [FAA], a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that valid agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *see also Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313 (3d Cir. 2019). The only issue before us is whether the parties formed a valid agreement to arbitrate.

"To determine if there is a valid arbitration agreement, a court must 'apply ordinary state-law principles that govern the formation of contracts.'" *Hrapczynski v. Bristlecone, Inc.*, Civil Action No. 20-cv-06014, 2021 WL 3209852, at *3 (E.D. Pa. July 29, 2021) (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017)). Here, the relevant state laws are those of

Pennsylvania and California, which the Court applies interchangeably.[5]  To form a contract in either State, the parties must manifest mutual assent.  *See Snow v. Eventbrite, Inc.*, Case No. 3:20-cv-03698-WHO, 2021 WL 3931995, at *2 (N.D. Cal. Sept. 2, 2021) ("Under California law, a valid contract requires the mutual consent of the parties[.]"); *Zabokritsky v. Jetsmarter, Inc.*, Civil Action No. 19-273, 2019 WL 2563738, at *3 (June 20, 2019) ("Under Pennsylvania law, the elements of an agreement are: (1) both parties must manifest an intention to be bound by the agreement; (2) the terms of the agreement must be sufficiently definite; and (3) there must be consideration." (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)).  That requirement applies with equal force to Internet-based agreements to arbitrate.  *See Berman*, 30 F.4th at 855–56 ("These elemental principles of contract formation apply with equal force to contracts formed online."); *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 58 (Cal. Ct. App. Mar. 29, 2022) ("These consent principles apply with equal force to arbitration provisions contained in contracts purportedly formed over the Internet." (quotation marks omitted)).

"Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct."  *Berman*, 30 F.4th at 855.  "Thus if a website offers contractual terms to those who use the site, and a user engaged in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed."  *Id.* at 856.  For example, courts frequently find mutual

---

[5] This Court previously found that there is not an "actual conflict" between the relevant laws of Pennsylvania (where Checchia lives) and California (where SoLo is located).  *See Checchia*, 2023 WL 3868369, at *6–7.  Because there is no actual conflict, the Court may apply Pennsylvania and California law interchangeably.  *See Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law.  If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."); *Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 512 n.4 (E.D. Pa. 2021) ("Pennsylvania choice of law rules first ask if there is an 'actual conflict' between the laws of the two states.  When there is no conflict, cases can be cited interchangeably or Pennsylvania law may be applied."  (cleaned up)).

assent when a website presents a user with a pop-up window containing specific contractual terms and requires the user to check a box explicitly stating "I agree" before they can continue. *See id.* at 856 (explaining that "'clickwrap' agreements" are "[t]he most straightforward application of these" contract principles and noting that "courts have routinely found clickwrap agreements enforceable"); *see also, e.g.*, *Oberstein v. Live Nation Ent'mt, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023)*; HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020); *Dobbs v. Health IQ Ins. Servs., Inc.*, Civil Action No. 21-5236, 2022 WL 2974713, at *4 (E.D. Pa. July 27, 2022). By contrast, courts are far more reticent to find mutual assent when a website "offers terms that are disclosed only through a hyperlink and the user manifests assent to those terms simply by continuing to use the website." *Berman*, 30 F.4th at 856 (explaining that "browsewrap" agreements "lie at the other end of the spectrum" from clickwrap agreements); *see also, e.g.*, *Lee v. Ticketmaster LLC*, 817 F. App'x 383, 394 (9th Cir. 2020); *HealthplanCRM, LLC*, 458 F. Supp. 3d at 331; *Brooks v. IT Works Mktg., Inc.*, No. 1:21-cv-01341-DAD-BAK, 2022 WL 2079747, at *5 (E.D. Cal. June 9, 2022).

Here, as the Court noted in our prior Memorandum, SoLo and Checchia's agreement falls somewhere between a clickwrap and browsewrap agreement. *See Checchia*, 2023 WL 3868369, at *8; *cf. Wiggins v. Lab. Corp. of Am. Holdings*, 2024 WL 4476646, at *8 (E.D. Pa. Oct. 11, 2024) ("LabCorp's website contains some hallmarks of both clickwrap and browsewrap agreements. On the one hand, to create an account, a user must check a box at the bottom of the registration screen affirming that they 'have read, understand and agree to the LabCorp Terms of Use and Web Privacy Statement.' . . . On the other hand, the terms themselves never appear via pop-up window; they must be accessed by affirmatively clicking the hyperlinked text."); *Kirkham v. TaxAct, Inc.*, Civil Action No. 23-3303, 2024 WL 1143481, at *8 (E.D. Pa. Mar. 15, 2024) (same).

"To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements," like the one at issue in this case, "have devised rules to determine [whether] meaningful assent has been given." *Berman*, 30 F.4th at 856. First, a "website operator can show that a consumer has actual knowledge of the agreement." *Id.*; *see also Nguyen*, 763 F.3d at 1176 ("[C]ourts have consistently enforced browsewrap agreements where the user had actual notice of the agreement."). When, however, the operator cannot show actual knowledge, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856; *accord Oberstein*, 60 F.4th at 515; *HealthplanCRM, LLC*, 458 F. Supp. 3d at 331.

**A.    Here, the Court need not consider whether Checchia had actual notice of the agreement to arbitrate contained in SoLo's Terms[6] because Checchia had inquiry notice of the agreement. The Court first explains why the notice was reasonably conspicuous before addressing how Checchia unambiguously manifested his assent to the agreement. Reasonably Conspicuous Notice**

When analyzing whether notice is reasonably conspicuous, the court views the website from the perspective of the reasonably prudent internet user, i.e., "a person who is neither an expert nor a novice with technology," which "permits certain basic, objective assumptions regarding the user's familiarity with commercial websites, hyperlinks, and online contracts." *Domer v. Menard, Inc.*, 116 F.4th 686, 695 (7th Cir. 2024); *accord Dhruva*, 2025 WL 748138, at *2; *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) ("In assessing intent, the object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.").

---

[6] Even if the Court were to reach this issue, we would find disputes of fact likely preclude summary judgment.

With this perspective in mind, the court considers both "the context of the transaction" and visual aspects of the notice to determine whether it was reasonably conspicuous. *Keebaugh*, 100 F.4th at 1019–20.

### 1.    Context of the Transaction

Beginning with the context of the transaction, since entry of our prior Memorandum, the Ninth Circuit, discussing California law, has emphasized that courts should consider the "full context of the transaction" when determining whether notice was reasonably conspicuous. *Keebaugh*, 100 F.4th at 1017 (quoting *B.D.*, 292 Cal. Rptr. 3d at 64); *accord Lawrence v. Finicity Corp.*, No. 24-1737, 2025 WL 547375, at *1 (9th Cir. Feb. 19, 2025). Specifically, the court must determine whether the typical user of the website "contemplates entering into a continued, forward-looking relationship," which they would expect to be governed by some terms of use. *Keebaugh*, 100 F.4th at 1017 (quoting *B.D.*, 292 Cal. Rptr. 3d at 64); *see also Oberstein*, 60 F.4th at 517 ("[I]n contrast with the noncommittal free trial offered in *Sellers*, the context of this transaction, requiring a full registration process, reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship."); *cf. Sellers v. Just Answer LLC*, 289 Cal. Rptr. 3d 1, 25 (Cal. Ct. App. 2021) ("[I]t is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them.").

Here, the context of Checchia's transaction with SoLo suggests a reasonable internet user would expect their access to the app to be continual and subject to specific terms and conditions. In 2022, users were required to download the SoLo app onto their phone and create an account; they could not apply for loans or use SoLo's services simply by going to its website. *See*

*Keebaugh*, 100 F.4th at 1020 ("An app is different from a typical one-and-done interaction between the user and a traditional website—the app's presence on the phone until deleted carries the connotation that the user will also have ongoing access to that app unless something material changes.").  Moreover, the purpose of SoLo's app was to "connect[ ] third-parties seeking to borrow money . . . with third-parties offering to lend money."  (Doc. No. 40-9 at 3.)  This financial purpose further suggests a continuous relationship—at least until the loan is paid off— and a reasonably prudent internet user would expect that relationship to be governed by some terms and conditions.  *See Lawrence*, 2025 WL 547375, at *2 ("[A] reasonable consumer would expect to have a continuing, forward-looking relationship with the entity they are entrusting with their bank data to track their account over time."); *see also Dhruva*, __ F. 4th __, 2025 WL 748138, at *3 ("[W]hen a user signs up for an account, enters his credit card information, and chooses a subscription plan, that registration process clearly contemplates some sort of continuing relationship beyond a one-time exchange of money for a single good or service."); *Domer*, 116 F.4th at 700 ("Reasonable consumers understand there will be terms and conditions associated with using a website" to make purchases.); *Keebaugh*, 100 F.4th at 1020 ("GOTC allows users to purchase in-app advantages and time-saving resources to utilize in the game. Users who download a game without a trial period, and especially those who intend to spend money within the game . . . likely expect (and reasonable prudent users should expect) their access to the game to be continual.").

Thus, the Court finds the context of the transaction weighs in favor of finding SoLo's Terms and Checchia's agreement to those Terms were reasonably conspicuous.

2.    **Visual Aspects of the Notice**

Turning to the "visual aspects of the notice," courts frequently consider the

"conspicuousness and placement of the . . . hyperlink[ed terms of use], other notices given to the

user of the terms of use, and the website's general design in determining whether a reasonably

prudent user would have inquiry notice of [the] agreement." *Chabolla v. ClassPass Inc.*, __

F.4th __, No. 23-15999, 2025 WL 630813, at *6 (9th Cir. Feb. 27, 2025) (quoting *Oberstein*, 50

F.4th at 515); *see also Lawrence*, 2025 WL 547375, at *1 (explaining that courts frequently

consider "the size of the textual notice, its color as compared to the background it appears

against, its proximity to any box or button the user must click to continue use of the website, the

obviousness of any associated hyperlink, and whether other elements on the screen clutter or

otherwise obscure the textual notice" (quotation marks omitted)); *Domer*, 116 F.4th at 695

("When deciding whether an online disclosure has afforded fair notice, we consider five

elements:  (1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and

coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal

relationship of the user's action.").

This Court previously found it significant that SoLo's hyperlinked phrase, "Terms of

Service," appeared in the same dark teal as the lines of text surrounding it and was located

multiple lines above the check box next to, "I agree to SoLo's Terms & Conditions":

> Significantly, "Terms & Conditions" is *not* hyperlinked to the Terms, nor does
> it appear in any special color, font, or format. Further, "Terms of Service"
> (which SoLo avers is hyperlinked and leads to its Terms) appears about seven
> lines above the "I agree" checkbox. In other words, the actual hyperlinked
> "Terms of Service" is not in close proximity to the "I agree" checkbox.
>
> In addition, "Terms of Service" appears in a blueish-green color and is not
> underlined or capitalized. It is also the same exact font size and color as the five
> lines that appear directly beneath it, which include: "Privacy Policy," "E-Sign
> Disclosure," "SynapseFi's Terms of Service," "SynapseFi's Privacy Policy,"

and "Evolve's Deposit Agreement." It is also approximately the same font size as the "The SSN I entered is my own" and "I agree to SoLo's Terms & Conditions" checkboxes that follow.

*Checchia*, 2023 WL 3868369, at *9. But when the notice and accompanying hyperlink are viewed as part of the entire sign-up process (and in light of the more recent, persuasive holdings of the federal appellate courts) the Court is no longer convinced that this prior ruling was correct.

Although "Terms of Service" does not have the traditional appearance of a hyperlink (i.e., light blue coloring and underlining), it does follow the format for hyperlinks used throughout SoLo's sign-up process. *See Domer*, 116 F.4th at 695 ("[T]he question is whether the website provided reasonable notice 'in light of the whole webpage.'" (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016)); *see also Berman*, 30 F.4th at 856 (explaining that "it is permissible to disclose terms and conditions in a hyperlink," so long as the hyperlink's presence is "readily apparent"). On each page of the sign-up process, hyperlinks appear in bolded, dark teal text. (*See* Doc. No. 40-9 at 13–19 ("Get help" in dark teal); Video at 1:00–1:06 ("Didn't get a code? Resend." and "Got it" in dark teal); Doc. No. 40-9 at 15–17 ("Learn more about ID verification" and Blurry photo? Tap here to retake." and "Take Photo of Front of ID" and "Take Photo of Barcode on Back" and "Take Photo of Back of ID" in dark teal).) And at least two buttons transitioned from faded to dark teal when they became active. (*See* Video at 00:37–1:00 ("Send SMS Verification" turning from faded to dark teal); *id.* at 3:43–3:44 ("Looks Good, Let's Go" turning from faded to dark teal).)

When placed in this context, a reasonably prudent internet user would understand—at least by the time they reached the final screen—that bold, dark teal text was being used to signify hyperlinks. *See Hine v. LendingClub Corp.*, No. 2:22-CV-00362-CRE, 2023 WL 8113234, at *7 (W.D. Pa. Nov. 22, 2023) ("The terms "Loan Agreement and Borrower Membership

Agreement" were hyperlinked in green font in the electronic signature checkbox, whereas the rest of the text on the webpage is in black font. . . .  Immediately below the electronic signature and acceptance of agreements box is the "Confirm" button, which is also contained in a green box with white font, indicating text in green font were hyperlinks a user could select."); *see also Domer*, 116 F.4th at 697 ("The hyperlinks to the Terms of Order are offset from the white background in a bright, green color, which as the district court observed, contrasts with the black text of the disclosure immediately above it. . . .  It does not matter that the text was green rather than the 'typical blue.'" (cleaned up)).

As for placement, the Court reiterates its concern that the "Terms of Service" hyperlink appears multiple lines above the check box next to "I agree to SoLo's Terms & Conditions." (Doc. No. 40-9 at 19.)  Best practice would have been for SoLo to link the phrase "SoLo's Terms & Conditions" in the line next to the check box or at minimum, to use consistent terminology ("Terms & Conditions") and labeling ("SoLo's") if the hyperlink needed to appear in the preceding lines.[7]  But, the Court also finds it significant that the hyperlink appears on the same screen as (and above) the check box, such that it is "part of the natural visual flow of reviewing the page."  *Domer*, 116 F.4th at 698; *see also id.* ("The bold 'Please note' draws the user's eye to the information, and the disclosure and hyperlink are very close together with the hyperlink appearing directly below the disclosure.  It is enough that the disclosure and hyperlinks are 'clearly visible when viewing the page.'"); *Dhruva*, __ F. 4th __, 2025 WL 748138, at *2 (finding it sufficient that the hyperlinked terms were "close to the payment tabs that the customer had to fill out and the button that the customer had to click" (cleaned up)); *cf. W.W. Allegheny Health*, No. 2:23-CV-01163-CCW, 2025 WL 634390, at *6 (W.D. Pa. Feb. 27, 2025) (finding

---

[7] The Court discusses these inconsistencies as part of the analysis on manifesting assent.

hyperlink was "not reasonably conspicuous" where users were required to "scroll past several sections of content to reach the footer containing the hyperlink," which was "one of over forty links in the footer").

And although the hyperlink for "Terms of Service" is the same size as the rest of the text on the page, its bold, dark teal appearance stands out against the white background in ways the unlinked, light grey text does not.  (Doc. No. 40-9 at 19); *see Wiggins*, 2024 WL 4476646, at *9 ("Although it is best practice to underline and capitalize the linked text to ensure that it is sufficiently set apart from the surrounding text, highlighting it in a contrasting font color, as LabCorp did in blue, can help do that." (quotation marks omitted)); *Hine v. LendingClub Corp.*, 2023 WL 8113234, at *7 (W.D. Pa. Nov. 22, 2023) ("While the Loan Agreement and Borrower Membership Agreement hyperlinks are not underlined or in bold font, it would be readily apparent to a reasonably prudent Internet user that distinct green font used for document descriptions like 'Loan Agreement' and 'Borrower Membership Agreement' while all other surrounding text is in black font would contain hyperlinks."); *see also Domer*, 116 F.4th at 697–98 ("Domer claims the text of the disclosure above the hyperlinks was impermissibly small.  Yet the font was the same as much of the surrounding text, and more is not required."); *cf. Berman*, 30 F.4th at 856–57 (finding the "text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous" where it was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye").

Last, the Court considers the overall design of the webpage and finds that this too weighs in favor of a finding of conspicuous notice.  The screen where the notice and hyperlink appear is not cluttered, nor is there other lettering or symbols, which would draw the user's eye away from

the dark teal hyperlinked lines of text. (*See* Doc. No. 40-9 at 19); *see also Dhruva*, __ F. 4th __, 2025 WL 748138, at *2 (emphasizing that the hyperlinked language was "on an uncluttered background" and "nothing about the website design or layout obscured the conspicuous location of the Terms of Use hyperlink" (cleaned up)); *Domer*, 116 F.4th at 696 ("[The] page is streamlined, well-spaced, and internally consistent. There is ample white space; nearly all the text and images on the screen are pertinent to the checkout process; and the page is organized into just a few neat boxes and columns."); *Lawrence*, 2025 WL 547375, at *2 ("The disclosure page's visual elements also contain many hallmarks of conspicuous notice. The page is uncluttered, and the hyperlinks are bright orange against a white background.); *cf. Berman*, 30 F.4th at 857 (considering the "overall design of the webpage" and noting that "other visual elements draw the user's attention away from the barely readable critical text").

For those reasons, the Court finds that the visual aspects of the notice, including the coloring and size of the hyperlinked text, its placement near the check box, and the overall streamlined design of the webpage, weigh at least slightly in favor of a finding of conspicuous notice.

\*　　\*　　\*

In sum, with the benefit of a complete record—including the screen recording showing the entire sign-up process—as well as the recent, persuasive holdings of the Fourth, Seventh, and Ninth Circuit Courts of Appeal, the Court finds that SoLo's notice was sufficiently conspicuous that a reasonably prudent internet user would have been aware of SoLo's Terms.

### B.    Unambiguous Manifestation of Assent

That leaves the question of whether Checchia unambiguously manifested his assent to be bound by those Terms. "A user's click of a button can be construed as an unambiguous

manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of the agreement." *Berman*, 30 F.4th at 857; *cf. Nguyen*, 763 F.3d at 1177 ("[W]here the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements."). In other words, "the notice must explicitly notify the user of the legal significance of the action she must take to enter into a contractual agreement," e.g., checking a box, pressing "continue," or creating an account. *Berman*, 30 F.4th at 858; *see also B.D.*, 292 Cal. Rptr. 3d at 59 ("[I]n order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the customer in a manner that made it apparent the customer was assenting to those very terms when checking a box or clicking on a button." (quotation marks omitted)).

Here, Checchia does not dispute that he checked the box next to the phrase, "I agree to SoLo's Terms & Conditions."[8]  Instead, he takes issue with the inconsistent references to SoLo's Terms, noting that the check box references assent to "SoLo's Terms & Conditions," while the hyperlink is labeled "Terms of Service."  (*See* Doc. No. 40-9 at 19; Doc. No. 41 at 12.)  This Court previously found such differences dispositive.  *See Checchia*, 2023 WL 3868369, at *9 & n.6 (recognizing that, at the time, this case presented a unique fact pattern).  However, after we issued our prior Memorandum, the Ninth Circuit addressed a similar issue in *Keebaugh*.

In *Keebaugh*, the court considered the sign in screen for a gaming app, which stated that "By tapping 'Play' [the user] accept[s] the Terms of Use and acknowledge[s] the Privacy Policy."  *Id.* at 1011, 1020.  Directly below that statement were two hyperlinks, one labeled

---

[8] Although Checchia testified that he does not remember checking the box, he has not put forth any evidence to dispute SoLo's proof that a user had to check the box before they could use SoLo's app to request loans.

"Privacy Policy," and the other labeled "Terms of Service." *Id.* at 1011.  The Ninth Circuit rejected the plaintiffs' argument that they could not have "unambiguously manifest[ed] their consent to be bound by the Terms of Service," given the notice's reference to "Terms of Use." *Id.* at 1021 n.6.  The appellate court explained that "mutual assent is based on 'the reasonable meaning' of the parties' words," and "[g]iven the prevalence of Terms of Use and Terms of Service in modern society and the frequency they are presented to users, it is clear from the context what was meant by 'Terms of Use.'" *Id.*

As noted above, best practice would have been for SoLo to use consistent terminology ("Terms & Conditions") and labeling ("SoLo's") for its Terms.  Nevertheless, the Court follows *Keebaugh*'s lead and finds a reasonably prudent internet user would have known that they were manifesting assent to the "Terms of Service," when they checked the box suggesting acceptance of "SoLo's Terms & Conditions."  These phrases are often used interchangeably to refer to a website's terms of use.  And although SoLo failed to label the "Terms of Service" as being its own, that was the only hyperlinked text to which the notice reasonably could have applied.  As a reminder, immediately preceding the check box were six hyperlinks:



(Doc. No. 40-9 at 19.)  The lack of any label on the first three hyperlinks (as opposed to the labels included on the final three hyperlinks) suggests each of those documents was SoLo's, the company that owned and operated the app.  And to the extent there was any ambiguity, only one of the other links referenced "Terms of Service," and that one was clearly labeled as "*SynapseFi's* Terms of Service," which meant it was not "*SoLo*'s Terms & Conditions."  (*Id.* (emphases added).)  Finally, a user needed only to click the first hyperlink to be taken to the Terms, which show, in the first sentence, that they were the "SoLo Terms & Conditions" to which the user was agreeing by checking the box:



(Doc. No. 40-9 at 21.)

Accordingly, the Court finds that Checchia unambiguously manifested assent to SoLo's Terms when he checked the box next to the phrase "I agree to SoLo's Terms & Conditions."

## V.    CONCLUSION

In sum, the Court finds that notice of SoLo's Terms, which included a mandatory arbitration clause, were reasonably conspicuous and that Checchia manifested assent to those Terms.  Thus, the Court grants SoLo's motion to compel arbitration.  The Court need not address

the parties' remaining arguments as to whether Checchia had actual notice of the Terms, whether he had sufficient notice of the Terms given their reference in each loan agreement, and whether he was bound by later versions of SoLo's Terms by continuing to use the app after filing this action.  An appropriate order follows.